**GARY A. FARRELL**
ATTORNEY AT LAW
40 EXCHANGE PLACE
SUITE 1800
NEW YORK, NEW YORK 10005

Telephone (212) 822-1434
Fax (212) 482-1303
GaryFesq@aol.com
Garyfarrelllaw.com

January 9, 2024

Judge Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York
*Via hand delivery and ECF*

                                Re: U.S.A. v. Duane Leisenheimer
                                03 Cr 861 (NGG)

Dear Judge Garaufuis:

      As the Court knows, this defendant was convicted after a guilty plea pursuant to a cooperation agreement to one count of Racketeering Conspiracy wherein he admitted to two predicate acts: taking part in one murder and in possessing stolen goods (frozen shrimp). Additionally, he pled guilty to one count of Harboring a Fugitive, namely Bonanno organized crime family boss Joseph Massino, who was being actively sought by the FBI. Sentencing is currently scheduled for January 30, 2024, at 11 a.m. This letter is written pursuant to Rule 32 of the FRCP to advise the Court of several matters that the defendant will raise at the time of sentencing and to aid in the determination of an appropriate sentence.

      I.      **The Presentence Report**

      The defendant makes the following timely objections to the PSR, all of which are minor in nature, apart from the challenge to his criminal history category:

      ¶¶ 18, 21 & 23. The defendant agrees that he was "present" for the murder of Cesare Bonventre to the extent that he acceded to the request that his garage be used for a vehicle connected to the murder and that he acted as a lookout while sitting in a car in the vicinity of the garage. He was not present in the vehicle when Bonventre was initially shot, nor was he present in the garage when he was shot several more times. As a result of the defendant's minor role, the defendant and the PSR recommends that a 2-level reduction be applied per USSG §3B1.2(b).

      ¶56. The defendant objects to his prior 18-month confinement for civil contempt being counted as three criminal history points as a prior sentence thereby making him a Criminal History Category II. USSG §4A1.2 defines "prior sentence" as "any sentence previously imposed *upon adjudication of guilt*, whether by guilty plea, or trial, or plea of nolo contender, for conduct not part of the instant offense." (emphasis added). The PRS incorrectly notes that the contempt confinement constituted a "Class A Misdemeanor." PRS at ¶56. The order of

1

confinement signed by Judge Stewart clearly delineated that the confinement was pursuant to Title 28, United States Code Section 1826(a). See Order, Enclosed as Exhibit A. Title 28 is entitled "Judiciary and Judicial Procedures" and this subsection pertains to "Recalcitrant Witnesses." Although the defendant did spend 18 months in BOP custody this was not pursuant to a sentence in connection with a criminal case based upon an "adjudication of guilt." USSG §4A1.2. The order of confinement clearly specified that the defendant's confinement should last only "until such time as he is willing to comply with the order of this Court and to testify before said Grand Jury or until the expiration of the term of said Grand Jury or until March 18, 1986, whichever first occurs." Exhibit A. This is not how criminal sentences are worded, as the sentenced individual cannot end his confinement by adhering to a court order as Leisenheimer could have but chose not to.

Finally, the case of <u>United States v. Restrepo</u>, 936 F.2d 661 (2d Cir. 1991), is instructive as it described the difference between criminal sentence enhancements and civil confinement for contempt as follows:

> As a preliminary matter, we note our disagreement with the district court's legal analysis insofar as it equated the goals of civil confinement and the sentence enhancement for obstruction of justice. We have accordingly held that time served in civil contempt need not be credited toward a subsequent criminal sentence arising from persistent contumacious conduct. *Given the distinctive nature between the coercive nature of civil contempt and the punitive nature of a sentence enhancement for obstruction of justice, we see no basis for confinement pursuant to a proper contempt citation to justify forgoing an obstruction enhancement.*

936 F.2d at 669 (citations omitted, emphasis added).

¶66. Duane's youngest sister is Jaimee Conlin.

¶69. Duane's wife, Dianne Nuzzi, had both of her knees replaced.

¶75. Duane is a social wine drinker who does not drink scotch.

¶79. Duane worked as a driver for the New York Post and then the New York Times for seventeen years from 1986 to 2003.

¶81. Duane currently owns a 2000 Acura and a 2012 Jeep Grand Cherokee (Exhibit B). Duane has no knowledge of any judgments regarding Pocono Woodland Lakes from 1998 as he sold his property there several years before this judgment was entered.

¶84. As stated above the defendant's criminal history category should be a Level I, not a Level II, which would reduce the guidelines range to 235-293 months. However, as the defendant's criminal history category should now be a Level I (zero points), he is entitled to a 2-level offense level reduction pursuant to recently enacted USSG Amendment Section 4C1.1, (effective November 1, 2023). This would bring down the guidelines to 188-235, based on an

Offense Level 36 and criminal history category I. The defendant acknowledges that one of the criteria required in order to receive the adjustment is that "the defendant did not use violence or credible threats of violence in connection with the offense." USSG 4C1.1(3). The defense relies on the holding in United States v. Capers, 20 F.4th 105 (2d Cir. 2021) which held that RICO conspiracy, which the defendant pled guilty to, is not a crime of violence for enhancement purposes in connection with 18 U.S.C. §924(c) prosecutions. This rationale should be applicable in this instance as well.

¶98.  The Probation Department should agree that a departure under USSG §5K1.1 is warranted in this case based upon the plea agreement and the Government's sentencing memorandum which described the defendant's substantial assistance to the Government.

## II.  A Downward Departure is Warranted as a Result of §5K1.1.

### A.  Substantial Assistance to the Government

The defense respectfully relies primarily on the Government's Sentencing Memorandum (GSM) that describes in detail the extraordinary cooperation provided by the defendant. The Government provided an accurate picture of Duane Leisenheimer's cooperation and how it helped them obtain a conviction against Bonanno organized crime family boss, Joseph Massino. GSM at 1-3. Duane Leisenheimer testified at a trial, presided over by your Honor approximately twenty years ago, which resulted in Massino being convicted of multiple serious crimes, including RICO and RICO Conspiracy which included several murders as predicate racketeering acts. The Government noted that Leisenheimer "provided important testimony that helped the government establish Massino's guilt as to the murders of Alphonse 'Sonny Red' Indelicato, Philip 'Phil Lucky' Giaccone, and Dominick 'Big Trin' Trinchera in May 1981, Dominick 'Sonny Black' Napolitano in August 1981 and Cesare Bonventre in 1984." GSM at 2. Leisenheimer testified in a straight-forward, credible manner and maintained a polite and dignified demeanor throughout his cross-examination by a skilled defense attorney (Leisenheimer trial testimony is attached as an exhibit to the GSM). He owned up to the many crimes he committed in his life without making excuses or trying to minimize his actions. Massino received consecutive life sentences for these crimes. Finally, the defendant's cooperation directly led to the guilty plea of Louis "Louie HaHa" Attanasio for his role in the murder of Cesare Bonventre wherein he received a sentence of 180 months. GSM at 5.

The Government also pointed out that Massino's conviction at his trial, where Leisenheimer's testimony played an important role, in turn motivated Massino to become a cooperating witness for the Government, the first time an actual organized crime boss had done so. This cooperation, in turn, "led to a number of other substantial criminal prosecutions of members and associates of the Bonanno family." GSM at 5.

In the Government's 46-page Rule 35 motion for Massino's resentencing filed in 2013, they advised the Court that:

> During debriefings, Massino provided information about hundreds of individuals associated with organized crime, including members and associates of all five La

3

Cosa Nostra families that are based in New York City. The information that Massino provided has been used in the prosecution of ten cases and has greatly assisted the government in the continued dismantlement of La Cosa Nostra and the Bonanno family, in particular. Massino's cooperation was instrumental in the prosecution of many significant Bonanno family leaders, who took control of the family after the arrests of Massino and Vitale. As detailed herein, his cooperation was useful in the investigations of four successive leaders of the Bonanno crime family, including Vincent Basciano, Michael Mancuso, Salvatore Montagna and Vincent Badalamenti. Massino's information and cooperation also aided in the prosecution of many others, including the extremely dangerous crew of young mafiosi headed by Vincent Basciano, which included, among others, Dominick Cicale, Anthony Donato, Anthony "Ace" Aiello, and Joseph "Joey" Gambina. Due to Massino's cooperation and the making of the Massino tapes, that crew was dismantled and the members of it, and along with many other members and associates of La Cosa Nostra, have been held responsible for their crimes.
See Gov't Mot. For Resentencing, United States v. Massino, 03-CR-929 (NGG) (EDNY) ECF No. 1177, p.14-15.

Duane Leisenheimer's cooperation certainly contributed to Massino's conviction and life sentence and ultimately to his decision to cooperate with the Government and that cooperation led to dozens of convictions of violent mobsters.

### B. Section 5K1.1 Factors

Section 5K1.1 of the Sentencing Guidelines sets forth five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance: (1) "significance and usefulness" of assistance (5K1.1(a)(1)); (2) "truthfulness, completeness, and reliability" of information and testimony (5K1.1 (a)(2)); (3) "nature and extent of assistance" (5K1.1(a)(3)); "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from assistance" (5K1.1(a)(4)); and (5) "timeliness" of assistance (5K1.1(a)(5)).

The Government's detailed and thoughtful analysis of the above factors, which the defendant adopts in its entirety, shows that Duane Leisenheimer rendered not just substantial, but extraordinary assistance to the Government. GSM at 5-6.

The defendant can elaborate on the 5K1.1(a)(4) factor regarding the danger and risk of injury to him or his family that resulted from his assistance. When the defendant decided that he would cooperate in June of 2003 he was motivated by information that came from his lawyer through a private investigator that his life was in danger. TT 6965-6970. It was at this point that the defendant entered the witness protection program, and the FBI provided him with various "safe houses" to stay in up to and including and for several months after the trial of Joseph Massino. Duane's wife and young sons were not living with him during this period of nearly 18 months as he was residing out of state, and he rarely saw them. The many proffer sessions noted by the Government did not take place at the US Attorney's office but rather at off site

4

locations for fear of Duane's safety. In fact, his guilty plea was taken in a Brooklyn hotel as even the federal courthouse was considered not safe enough to risk bringing him inside.

Based upon all of the above, and of the information contained in the Government's Sentence Memorandum, the defense respectfully requests that the Court grant the Government's motion to depart below the guideline range in this case. GSM at 5-6.

## III.    18 U.S.C. § 3553(a)

### 1. The History and Characteristics of the Defendant

Duane Leisenheimer is 67 years old, and this case marks his only felony conviction, despite several prior arrests and his 18-month civil contempt confinement for refusing to testify before a grand jury investigating Joseph Massino in 1984. PSR ¶s 56-63. The defendant admitted to the Government during multiple proffer sessions, and while on the witness stand during Massino's trial, that while he was an associate of the Bonanno crime family he stole multiple automobiles, committed insurance fraud, trafficked in stolen goods, and sold and used illegal drugs, among other criminal activities. PSR ¶56-63, GSM at 2, Trial Tr. at 6835-6863.

Despite his admitted criminal past and ties with organized crime, the defendant managed to ultimately separate his street life from his family life. Dianne Nuzzi, Duane's wife since 1989, described him as the "best husband and nicest person who is loved by everyone." PSR ¶70. She offered no insight into his prior criminal activities as he had left "the life" of his own volition by the time she met her, and was working full-time as a truck driver for the New York Post. The enclosed letters from Duane's twin sons, and their wives, plus his brother, two sisters and other relatives, describe him as a compassionate, caring, loving husband, father, father-in-law, grandfather, and sibling who continues to play a huge part in all their lives (Exhibit C).

Justin and Ian Leisenheimer, Duane's twin sons, who were Division I baseball stars at the University of Maine, provided moving tributes to their father (Exhibit C). Ian, who manages a residential painting and wall covering company, described the influence Duane had on him as follows:

> My father made growing up easy for my brother and me. He led by example and for that reason my brother and I developed an unbreakable amount of trust and respect for him. When you see your father get up for work every day before the sun comes up and is home in time to do his daily checklist for my mother and make it to my games you start to think that maybe it is possible to be everything to everyone. You feel safe when he is around and the thought of being like him becomes a goal to strive for. Exhibit C.

Justin Leisenheimer, the Senior Vice President at Palladium Window Solutions, echoed his twin brother's thoughts about their father in his poignant letter to the Court:

> Family has always been the number one priority in our lives. I learned that at a young age, and it has stuck with me for my whole life. There aren't many people

5

that are fortunate enough to grow up with one parent let alone two amazing parents. I owe everything I am today to Mom and Dad. I grew up in a safe and loving home where I knew I could talk to my dad about anything. As my wife and begin the journey to start out own family I look forward to becoming a father because I learned from the best. Exhibit C.

Duane's two daughters-in-law, Cristina Perez and Erin Moore, like their husbands, praised Duane for his work ethic and devotion to his family. Ms. Moore acknowledged the transformation of Duane as he previously had a "not so pure" way of life to the "genuinely changed man he is today." Ms. Perez noted that Duane is the "best father-in-law and grandfather (to her one-year-old daughter) that I could have asked for and his entire family is truly so grateful to have him in our lives." Exhibit C.

Duane likewise received a ringing endorsement from Erin Moore's father, Douglas Moore, a retired Police Lt. from Waldwick, New Jersey, who worked in law enforcement for 26 years:

> My initial assessment of Duane Leisenheimer was that he is a genuine, family man who understands what is important in life. Over the past 5 years, that assessment has only grown stronger. His dedication to the things that matter most in life. Over the past five years, that assessment has only grown stronger. His dedication to the things that matter most in life is a fine example to set for all who have come to know and love him. Exhibit C.

Two of Duane's sisters, Debra Rufrano (2 years older) a long-time public school guidance secretary and Jamee Conlin (9 years younger), a paralegal for 36 years, have written to the Court describing the cramped house they grew up in with Duane sharing just a few rooms with seven siblings and their parents (Exhibit C). Both his sisters remarked on the transformation of Duane from a "corner kid" who fell in with the "wrong crowd" to a responsible husband and father. Ms. Conlin also added that Duane has a strong sense of duty to help others, not his just relatives, who are in need:

> Duane is the guy who will drive the old lady on the block to the grocery store in order to help make sure he can carry her bags to her home when she is done. He is the guy that sees the older gentleman struggling with a household project and will jump in to help. He is the man that will re-do the rooms in the house in order to make sure his granddaughter has a wonderful place to stay when she is in the care of her grandparents. He is the man that will put that same baby in her carriage and walk her around the park the minute he has come home from working after a 10-hour shift. . . He is the man who turned his whole life around to be the husband and father he is today. Exhibit C.

Duane's younger brother Adam Leisenheimer, a union steamfitter for 43 years, noted that, "Duane has proven himself to be a supportive, caring, and dedicated worker, husband, father, and brother." Jonathan Nuzzi, Duane's nephew, a Senior Director for American Tartaric

6

Products, Inc., echoed this theme when he related how Duane has played the role of grandfather to his young son as both of his parents have passed away. Exhibit C.

Frank Nuzzi, Duane's brother-in-law, and the owner of a very successful NYC based painting company, remarked how caring Daune was for his mother-in-law (Frank's mother) when she was sick, as a "first-time father to twin boys and the way he was able to balance all of it was very telling of the type of man he is." Exhibit C. Chris Nuzzi, Duane's other brother-in-law (now ex), a long-time truck driver for UPS and now Local 817, raves about how the breakup of his marriage to Duane's sister did not change their relationship in any way:

> If I was ever in a jam or needed help I would call Duane before my own brothers. He is Mr. reliable, and always has been since the day I met him.
> He never let it seem strange that there was new person in my life who wasn't his sister and treated her like family from day on. He is godfather to my son who is autistic. From the moment we got his diagnosis, Duane couldn't have been more helpful and supportive. He treats John just like any other 17-year-old, which is not easy because he is anything but. Duane and my sister, Dianne, always donate to John's school, Eden II and when we have fundraisers or walks for autism Daune is always available, which is isn't always easy for a guy who always seems to be working. I don't know the old Duane, but I have trouble believing they are the same person. Exhibit C.

Duane Leisenheimer has shown the capacity to help others outside of his family as well. When his friend Dr. Bijan Anvar, a dentist, was diagnosed with throat cancer Duane stepped up in spectacular fashion:

> Duane was a life saver for me and my family for me and my family and was always there when I (we) needed him. When it got to the point that I could not drive myself to my treatment (from Westchester to downtown Manhattan) he would come to Westchester from his home in Queens and drive me into the city and then drive back to Westchester and then he would always ask if I needed anything before he left. He became a second father to my children! He gave them stability and security in a time when no one knew if I would live or die, and quite honestly toward the end of my treatment, I was not looking so good. He took them to games, both played sports, he was what I couldn't be. This was not only helpful to me and my children, but also my wife. Exhibit D.

Dr. Anvar's 19-year-old son, also named Bijan, who attends Franklin and Marshall College and plays on the school's baseball team, shared his feeling towards "Uncle Duane" in heartfelt fashion:

> My Dad was sick for roughly two years, and I was eight and nine years old when I began playing baseball. All my friends had hitting lessons, private coaches, or dads to help them play with them and practice. Financially we couldn't afford coaches because of the chemo and my dad was never around. Duane stepped up in a massive role in life for me at that time. Along with the countless times he

7

and his sons dragged my Dad out of bed to do chemotherapy or the number of times he would watch my sister and me when my mom was with my Dad at the hospital. He was there for us every step of the way and ensured my sister and I were not affected by this. Exhibit D.[1]

Anthony LaPorta is one Duane's oldest friends with their friendship going back 55 years. Mr. LaPorta had an outstanding 37-year career for the NYPD, having been a police officer, detective and sergeant. He concluded his long and distinguished career as the Assistant Integrity Control Officer for the Intelligence Bureau. Ironically, as a teenager he worked at the Delicatessen that was later owned by Joe Massino. He described Duane as having been "very kind to me and my family, an extremely hard worker, and a person I would describe as loyal and trustworthy." Exhibit D.

Stanley Swiatocha, a long-time human resource manager and his son, Travis, a former officer in the United States Marines (11 years of service) and now a technology consultant, recall their neighbor and friend Duane very fondly. Travis, who described himself as "best friends" with Duane's twin sons, reflected on his role as a new father and credits Duane tremendously for his influence:

> I'd like to share a few ways that Duane has helped my fatherhood style. Duane is one of the hardest working fathers I know, endlessly committed and dedicated to supporting his family. Through rain, snow, or shine, he was at work before the sun was up, and home late in the evening. But he was always present, meaning at dinner or baseball games or picking us up from practice. He always found the time for his boys. He was there, tired yes, but he was there and never a complaint. . . But most importantly, no matter what happens, he always put his family above all else. I hope one day my boys will say the same about me. Exhibit D.

Duane received letters of support from his long-time friends, Lorraine and John Carrera, who are sister and brother. Lorraine owns a medical billing practice and John is retired counsel for the paper packaging company WestRock. They both know Duane to be "kind, caring and always ready to lend a hand." Lorraine implored that the Court, "judge him on his current life, not that of a very young man who made some bad decisions." Exhibit D.

As set forth in the PSR, Duane Leisenheimer has an employment history dating back to working as a driver for the New York Post and later the New York Times from 1986-to-2003. PSR¶s 78-80. Since 2004, Duane has been gainfully employed by Sprague Operating Resources LLC. Anthony Guidice, the Director of Fleet Operations for this company who supervises 80 people, wrote glowingly about Duane's skills as a driver and driver instructor, his work ethic, and his commitment to the customers:

> Duane is an excellent driver, strictly follows all Sprague policies and procedures and has good relationships with his co-workers as well as our customers. Because

---

[1] Duane's friend of 40 years, Jeanne Laino likewise recounted how Duane helped her through traumatic events in her life such as her divorce, the death of her son and parents as well as her battle with colon cancer. Exhibit D.

8

> of Duane's model performance with Sprague, we use him in the capacity of a driver trainer where he is sent out on the road with new drivers to observe their driving behaviors and to ensure deliveries are made correctly and safely. Additionally, Duane is a certified Smith System Driver Instructor for Sprague. . . During the driver review performance review periods, Duane consistently receives a rating of "exceeds expectations" to "outstanding performance" year after year. Duane is my first choice when we need to participate in a customer event or delivery demonstration where customers will have others present to witness the delivery. Exhibit E.

Duane's former boss, Gary Pellegrino, who recently retired from Sprague, likewise praised Duane, who he hired in 2004, as a "very valued employee." The two men have remained friends after Mr. Pellegrino left the company as Duane is "always available to help anyone that needs it." Exhibit E. Finally, co-worker, Evan Charlton, a Pentecostal Minister for more than 20 years, also praised Duane:

> I am also a professional truck driver and had the pleasure of working with Mr. Leisenheimer at Sprague Energy Petroleum where Dwayne has been a long-time co-worker and friend. He is dependable, reliable and a very responsible man who possesses good and reliable character. Exhibit E.

Duane Leisenheimer has several health issues that are outlined in the in the PSR along with the various medications he takes to treat them. PSR ¶73. Overall, Duane is in reasonably good physical and mental health. PSR ¶74.

Duane Leisenheimer wrote to your honor for the purpose of expressing his sincere remorse for his role in the killing of Caesar Bonventre:

> I have so much remorse and so many regrets. Not a day goes by that I don't think about the families that were affected by my participation. A child born that never met their father, knowing that I participated in that is something that I can never forgive myself for. I have a 19-month-old granddaughter, who is the world to me. I think that what if her daddy didn't come home. What if one of my sons never came home? I now have my second daughter-in-law who is 5 months pregnant, and I think of Caesar's wife 40 years later as well as all of the other victims who suffered because of things I participated in. Exhibit F.

### 2. The Need for the Sentence Imposed

There are several additional factors listed under 18 U.S.C. § 3553(a) (2) that the Court must consider in order to "impose a sentence sufficient, but not greater than necessary to comply with the purposes of sentencing." Some of these factors have already been addressed and the defense will seek to address the remaining ones in combination with each other and elaborate on some others at sentencing.

9

Although there can be no question that participating in a murder, albeit as a lesser participant than others involved in that murder, constitutes the gravest of offenses, the defendant accepted responsibility for his role in this heinous crime during many proffer sessions with the Government and then again at the trial of the notorious head of the Bonanno crime family, Joe Massino. GSM at p. 5-6.

As noted above, the defendant is part of a close-knit family who are very dependent on his continued participation in their lives. The defendant has lived a law- abiding life since his release on bond more than twenty years ago in 2003 and he has not been under any supervision. GSM at p. 6. He is not, at this stage of his life, a danger to the public.

### IV.     Recommendation

The Court is well aware that the Supreme Court and the Second Circuit have recently held that, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008); see also Gall v. United States, 128 S.Ct. 586 (2007); Kimbrough v. United States, 128 S.Ct. 558; Rita v. United States, 551 U.S. 338 (2007). When arriving at the proper sentence the court may not presume the Guidelines sentence is reasonable, but "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189.

For all the above reasons, Duane Leisenheimer is requesting that the Court impose a sentence of the time he has already served. This sentence would allow him to continue to play an important role in his tight-knit family and allow him to remain gainfully employed. This sentence would be sufficient punishment in this case based upon this defendant's unique background, the extraordinary assistance he rendered to the Government, and all of the facts surrounding the case.

Finally, the defense respectfully submits that this is the atypical case where no period of discretionary post release supervision should be imposed. The defendant has been released to the community without supervision since 2003 and he has committed no crimes and by all accounts has been a productive citizen. PSR at p.1, GSM at p.6. There is absolutely nothing to suggest that this will likely change in the future as the defendant's life revolves entirely around his immediate family, friends, and employment (Exhibits C-E). Furthermore, should he be required to visit Pre-trial Services at this courthouse he runs the risk of being seen by members of organized crime who are under similar supervision. This potentially could lead to threats or violence being directed at Duane or his family.

Respectfully submitted,

Gary Farrell<br>
Attorney for Duane Leisenheimer

cc: AUSA Michael Gibaldi (via email and ECF)
    Probation Officer Jaime Turton (via email)